**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0916n.06

**No. 09-2180**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*Aug 20, 2012*

LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE WESTERN |
| PHILLUP HICKS, | ) DISTRICT OF MICHIGAN |
| | ) |
| Defendant-Appellant. | ) |
| | ) |
| | ) |
| | ) |

**BEFORE:  GIBBONS, ROGERS, and COOK, Circuit Judges.**

**ROGERS, Circuit Judge.**  Criminal defendant Phillup Hicks appeals his conviction following a jury trial that found him guilty of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1).  During the first day of Hicks's trial, jailhouse phone recordings between Hicks and his girlfriend, Priscilla Claudio, and his mother, Tracy Hicks, were made available to the prosecution.  Hicks claims that the recordings prove that Priscilla knew that it was her brother, not Hicks, who owned the gun, and that the late disclosure of the recordings violated Hicks's due process rights under *Brady*.  Though the district court did not rule specifically on Hicks's purported *Brady* violation, the court expressed discomfort with the delayed disclosure of the tapes, and ultimately decided that the Government and defense counsel could listen to the tapes between the first and second days of trial.  The Government recalled Priscilla Claudio as a witness to recant her earlier

testimony that she had not been in communication with Hicks and had not discussed details of the case with him.

There are three issues presented in this appeal: (1) whether the government's mid-trial disclosure of jailhouse recordings violated Hicks's due process rights under *Brady*; (2) whether the district court erred by admitting the parties' stipulations concerning elements of the crime without Hicks's personal consent; and (3) whether there was sufficient evidence of guilt to deny Hicks's motion for judgment of acquittal. Because Hicks cannot prove that the mid-trial disclosure of the phone recordings was prejudicial, or that the Government knowingly obtained his conviction on false testimony, Hicks's *Brady* claim lacks merit. In addition, this court's precedent does not require Hicks's personal consent for factual stipulations that are facially valid and do not constitute a de facto guilty plea. Finally, there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Hicks was guilty, and the district court therefore did not err in denying Hicks's motion for judgment of acquittal.

On April 27, 2008, Priscilla Claudio and her boyfriend, Phillup Hicks, who had previous felony convictions for breaking and entering and fleeing the police, were at a local club/bowling alley in Lansing, Michigan to celebrate a friend's birthday. R. 37, Trial Tr. at 42, 44. Priscilla Claudio and Hicks had been drinking and, at some point in the night, Priscilla got into a fight with two individuals, Veronica and Pablo, at the club, sustaining a "busted lip and a black eye." *Id.* at 43.

Priscilla called her father and brother, Joseph Claudio, after the fight. Joseph Claudio, who was 17 years old at the time, drove over to the club/bowling alley with his friend Terry Morgan. During trial, both admitted they had been drinking that day and night. *Id.* at 84, 87, 157. Priscilla

2

Claudio and Hicks got into the car with Joseph Claudio and Terry Morgan and drove to Veronica's house.

At this point during the testimony, the three witnesses provided slightly different versions of the events. Priscilla Claudio stated that after learning that Veronica and Pablo were not at the house, the group drove to another nearby location where they thought Veronica and Pablo might be. Veronica's van, which Priscilla Claudio recognized from the club, was parked in the driveway. *Id.* at 62, 66. Priscilla Claudio testified that Hicks, Morgan, and Joseph Claudio got out of the car to throw rocks at the van. *Id.* at 47. Though she testified that she did not see anyone with a gun, she stated that at that point she heard something that sounded "kind of like a firework," and that she smelled something like "burnt rubber." *Id.* at 48-49. After this, the group got back in the car, with Hicks driving. Priscilla testified that they were stopped almost "immediately" by a police officer. *Id.* at 48. At that point, Hicks fled.

Joseph Claudio testified that Hicks began driving on the way to the second house, earlier than Priscilla Claudio had suggested. *Id.* at 87-88. Joseph Claudio testified that Terry Morgan was in the front passenger seat, that he was behind Terry, and that Priscilla Claudio was behind Hicks. *Id.* at 88. On direct examination, Joseph Claudio stated that everyone except him got out to collect and throw rocks at the van, *id.* at 91, but on cross-examination he altered his story to testify that only Priscilla Claudio threw the rocks. *Id.* at 115. The group then drove slowly past the van, at which point "Terry leaned his seat back a little bit," and then Hicks "just started firing out the window." *Id.* at 92. Hicks then drove away. After seeing a cop "coming the opposite way," *id*. at 94, Joseph Claudio first testified that he "t[ook] the gun from the front seat" then corrected his testimony to say that the gun was "passed . . . back" to him and that Hicks told Claudio to throw the gun out of his

3

window. *Id.* at 95-96. After they were stopped by the police officer, Terry Morgan put the car in park while Hicks fled. *Id.* at 97-98.

Terry Morgan's testimony was similar to Joseph Claudio's. Like Joseph Claudio, Morgan stated that it was Hicks who was driving after the first stop. *Id.* at 146. Unlike Joseph and Priscilla Claudio, Morgan testified that the group gathered rocks from the bowling alley and Morgan did not remember any rocks being picked up at the second house. *Id.* at 147-48. Like Joseph Claudio, however, Morgan testified that it was Hicks who fired the gun out of Morgan's front passenger window after Hicks had told him to lean back. *Id.* at 149. Morgan also agreed with Joseph Claudio that Hicks handed the gun back to Joseph and asked him to throw it out of his window while Morgan put the car in park. *Id.* at 153-54.

Officer Ryan Wilcox of the Lansing Police Department stated that he observed the vehicle driven by Hicks fail to come to a complete stop at a stop sign. *Id.* at 7-8. Officer Wilcox tried to pull the car over, but instead of slowing down the vehicle accelerated. *Id.* Officer Wilcox followed, and "[a]s the vehicle came to an abrupt stop," a "silver object" was thrown "out of the back passenger side window." *Id.* at 8. The driver then exited the vehicle and fled. *Id.* at 8. As there were three individuals in the vehicle and a firearm had been throw, Officer Wilcox requested more units to assist. *Id.* at 10.

Other officers arrived and after searching the area located a Sable Baby, .22 caliber revolver with one live round and five spent casings in the wheel. *Id.* at 11, 170-171. The gun was located "maybe ten yards" from the vehicle. *Id.* at 11. A small handgun case was also found underneath the driver's side seat of the vehicle. *Id.* There were no fingerprints on the shells or on the gun. *Id.* at 37-38.

4

In March 2009, a grand jury returned a single-count indictment charging Hicks with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). Prior to trial, Hicks's defense counsel and the prosecution agreed to three stipulations, namely that: (1) Hicks was a felon, (2) the firearm at issue was "fully operable" and thus "a 'firearm' as defined by federal law," and (3) the firearm was manufactured in Belgium and therefore "affects foreign and/or interstate commerce" because "it had to have crossed a national border and/or state line to end up in Michigan." R. 23, Stipulations. Hicks's counsel signed the stipulation. *Id.*

During trial, several officers from the Lansing Police Department testified, as well as Priscilla Claudio, Joseph Claudio, and Terry Morgan. After Priscilla Claudio had testified but before Joseph Claudio or Terry Morgan were called, the Government disclosed outside the presence of the jury that the Government had just received audio recordings of Hicks's phone calls from prison. These included conversations with Priscilla Claudio, who had previously testified that she did not have a continuing relationship with Hicks and had never discussed the details of the case with him. The Government claimed that it had "been asking for some time to try to get the recordings." R. 37, Trial Tr. at 75. When asked by the district court, defense counsel indicated that he had only learned of the tapes "ten minutes" earlier. *Id.* at 76. The district court expressed discomfort that the tapes were being disclosed "kind of [at the] eleventh hour," and determined that, at a minimum, "defense counsel should be able to hear the whole thing." *Id.* at 77. The Government agreed. When the Government suggested that the tapes could be useful "if [Hicks] ma[de] any statements against interest or any admissions," defense counsel objected. *Id.* at 79. The district court noted defense counsel's objection, stating that "a jury's already been sworn, and unless it's something that's

5

absolutely material in every respect to the case, I'll just presume that it's so late to be so prejudicial to the proceeding that [the Government] can go on without it." *Id.*

During a second discussion about the tapes, the district court noted that it did not want "a grand fishing expedition," and the Government agreed to limit its review of the recordings to those made by Hicks to his mother's phone number. *Id.* at 135-36. At this point, defense counsel agreed to listen to the tapes and "bring up [any] objections." *Id.* at 136. The district court again expressed discomfort with the late disclosure, saying: "I've never had one quite presented the last hour like this. This is really not excusable. I'm very uncomfortable with it. See if you can work it out." *Id.*

The parties discussed the tapes a third and final time during trial. At this point, defense counsel raised concerns with having to listen to over three hours of tapes, and with the difficulty of conferring with his client after Hicks was returned to the prison for the night. *Id.* at 173. The parties agreed to listen to what they could in the two hours they had before 5:30 pm, when Hicks would be returned to prison. The district court was still "very concerned" with the late disclosure, remarking that "this is really clumsy, and I fault the government for it." *Id.* at 174, 176. Still, the district court ultimately determined that it was possible to make it through the tapes because, "having listened to these things before . . . when you take all the chatter out and you take all the phone burps and everything out, you're really talking about a measurable amount of time." *Id.* at 176.

In court the next day, the Government stated that it was not going to admit into evidence or use the recordings in any way. *Id.* at 178. Instead, the Government recalled Priscilla Claudio to the stand, and on direct examination she recanted her earlier testimony that she had not been in contact with Hicks and had not discussed the case with him. *Id.* at 185-86. When the district court asked defense counsel if he had any remarks, he commented, "I don't think there's anything I can do about

6

[the Government's] calling a witness." *Id.* at 179. On cross-examination, defense counsel asked two question: (1) "But the essence of what you saw on that night, is that still true?" and (2) "And you have a close and loving relationship with your brother?" R. 37, Trial Tr. at 186.

Following the two-day trial, the jury found Hicks guilty of being a felon in possession of a firearm. After the verdict was read, defense counsel sought a Rule 29 motion for directed acquittal, but this motion was summarily rejected by the district court. *Id.* at 188-89.

During his sentencing hearing, Hicks expressed disbelief that he had been found guilty. When asked if he had anything to say, Hicks responded:

> They have a phone conversation of, you know, we talked about that they said they wanted to bring to court, the prosecutor did. I never even heard that. That was never presented in court where they got my phone conversation with [Priscilla Claudio] crying and saying he did it, her brother did it. To today I still have not heard that recording as it was said I would be able to hear . . . .

R. 38, Sentencing Tr. at 10. The district court dismissed Hicks's complaint, stating:

> [T]he characterization at this point that there are witnesses out there or that the witnesses may have changed their story and other such matters, this Court cannot countenance. A trial was held. It was carefully conducted. The jury was fairly and impartially chosen, and a decision was made. Now, to impugn the Court's reputation or anything like that is out of bounds.

*Id.* at 12-13. Hicks was sentenced to 96 months in prison, and he appeals. After receiving new counsel,[1] R. 39, Notice, Hicks filed a motion to supplement the record with the phone recordings that were disclosed mid-trial. The district court granted the motion in part, R.44, Order, and excerpts from the phone recordings were added to the record. R. 45, Phone Transcripts.

---

[1] On May 11, 2010, counsel for Hicks filed an *Anders* brief and moved to withdraw. On November 30, 2010, this court rejected the *Anders* brief but allowed Hicks's counsel to withdraw.

Though Hicks claims that "the entirety of the transcripts provides the best evidence supporting Mr. Hicks's innocence," Appellant Br. at 29, he points to the following as evidence that it was Joseph Claudio, not Hicks, who had the gun:

> PRISCILLA CLAUDIO: "Well, then [my brother is] gonna have to man up to what . . . he did because - -" R. 45, Phone Tr. at 15.

> PRISCILLA CLAUDIO: "Like I told Tasha, and Tasha told me the same thing. Tasha's like, look, she said, he's got - - your brother's got to man up to this . . . She goes, 'If it comes down to it, he can't put no man away for that long.' I was like, 'That's what I keep trying to tell them.'" *Id.* at 19-20.

> TRACY HICKS: "[Priscilla] told me on the way from seeing you. The very first time that me and her went out to see you at that jail . . . on my way back I said to her, you know, 'What's going on?' I said, 'Did Phillup really do this?' She said, 'No.' I said, 'Do you know who did it?' She's like, 'Yeah.' I'm like, 'Who?' She said, 'My brother.' Phillup, she told me that. That came out of her mouth. You didn't even tell me. She did." *Id.* at 53.

Hicks argues on appeal that: (1) the government's mid-trial disclosure of jailhouse recordings between himself, Priscilla Claudio, and Tracy Hicks violated his due process rights under *Brady*; (2) the district court erred by admitting the parties' stipulations concerning elements of the crime without his consent; and (3) there was insufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Hicks was guilty of being a felon in possession of a firearm.

As for the first issue, Hicks's *Brady* claims lack merit. Hicks argues that the Government's mid-trial disclosure of phone recordings between himself and his girlfriend, Priscilla Claudio, and his mother, Tracey Hicks, violated his due process rights. Hicks maintains that these calls included exculpatory evidence indicating that it was Priscilla Claudio's brother, Joseph, who possessed the gun, and that the delayed disclosure of the recordings hindered his defense counsel's ability to use this information effectively. While both defense counsel and the district court expressed discomfort

8

with the late disclosure of the phone recordings, R. 37, Trial Tr. at 77, 136, 173, 174, all parties ultimately agreed to listen to the tapes and respond accordingly the next day at trial. *Id.* at 176. After listening to the tapes, the Government decided not to offer any of the recordings into evidence, *id.* at 179, and instead recalled Priscilla Claudio to the stand. Defense counsel had an opportunity to cross-examine Priscilla, *id.* at 186, and at no point did defense counsel request more time to review the tapes.

In light of these facts, Hicks cannot establish a *Brady* claim through either of the two avenues he suggests. First, Hicks cannot prove that mid-trial disclosure of the phone recordings was prejudicial or that it had a material effect on the outcome of his trial. Second, though Hicks claims that the phone recordings create a reasonable likelihood that his conviction was based upon false testimony, this is not the case. We need not decide the Government's alternative arguments that Hicks waived his *Brady* claim, and that the tapes fall outside the scope of *Brady* entirely because Hicks knew the content of the phone recordings before the Government did.

Assuming for the sake of argument that the phone recordings were exculpatory, Hicks's *Brady* claim fails because he cannot show prejudice from the delayed production of the tapes had a material effect on the outcome of his trial. A *Brady* claim requires the defendant to show "that the Government suppressed the evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). *See Strickler v. Greene*, 527 U.S. 263, 282 (1999). Although "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to complete failure to disclose," *Davis*, 306 F.3d at 421, "[i]f previously undisclosed evidence is disclosed, as here, during trial, no *Brady* violation occurs *unless the defendant has been prejudiced by the delay in disclosure*."

9

*United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986) (emphasis added). *See also United States v. Spry*, 238 F. App'x 142, 147 (6th Cir. 2007); *Farrell v. United* States, 162 F. App'x 419, 424 (6th Cir. 2006); *United States v. Melton*, No. 85-3529, 1987 WL 36828, at *6 (6th Cir. Mar. 23, 1987).

Hicks argues prejudice by asserting that the "phone calls demonstrated that Priscilla Claudio had provided false testimony: she testified that she did not 'see any person with a gun,' but the phone recordings demonstrate that she saw her brother, Joseph Claudio, with the gun." Appellant Br. at 19 (citing R. 37, Trial Tr. at 66). In addition to potentially impeaching Priscilla Claudio, defense counsel also suggests that the information in the phone recordings could have been used to contradict the version of events put forth by Joseph Claudio and Terry Morgan, raising doubts as to who actually possessed the gun that night. *Id.* at 29. However, because Hicks had enough time to review the tapes, and could have asked for a continuance if more time was necessary, Hicks cannot establish that the Government failed to disclose the recordings in time for their effective use at trial.

Despite the delayed disclosure of the tapes, Hicks had sufficient time to prepare his defense. When a defendant has adequate time to prepare for trial, no *Brady* violation occurs despite delayed disclosure of exculpatory evidence. *See Davis*, 306 F.3d at 421; *United States v. Carter*, 1997 WL 528465, at *4 (6th Cir. Aug. 26, 1997); *United States v. Blanco*, 844 F.2d 344, 352 (6th Cir. 1988). Though defense counsel raised concerns about the time necessary to review the over three hours of phone recordings, and the district court suggested that it was "not satisfied that in fact the defense counsel was adequately apprised of what it was he was to defend himself against," R. 37, Trial Tr. at 183, ultimately the prosecution, the defense, and the district court agreed upon a solution—Hicks would stay at the court until 5:30 pm, so defense counsel could speak to him, and the prosecution

10

and defense would listen to the tapes between the first and second days of trial. *Id*. at 175-176. Court recessed at 3:37 pm, leaving defense counsel almost two hours to listen to the tapes prior to Hicks's transfer back to jail. The Government also limited the phone recordings to those Hicks made to his mother's phone number. *Id.* at 172. The following day, the Government did not offer any of the phone recordings into evidence, but instead recalled Priscilla Claudio to the stand to testify regarding her false testimony from the previous day. *Id.* at 178-79. When asked, defense counsel did not remark that he had had inadequate time to listen to the tapes and he did not request a continuance. *Id.* at 179. Instead, defense counsel cross-examined Priscilla Claudio, and then the matter was closed. If the tapes could have been used to impeach Priscilla Claudio, defense counsel had an opportunity to do so when the Government recalled her to the stand or defense counsel could have asked for more time to prepare such a defense.

Defense counsel's failure to request a continuance indicates that he had adequate time to prepare a defense. As we explained in *Crayton*, 357 F.3d at 569, "[a]ny disadvantage that a defendant might suffer because of the tardiness of [exculpatory evidence] can be cured by asking for a recess." The failure to ask for a continuance suggests that the defense had sufficient time to prepare and thus was not prejudiced by the delayed disclosure. *See Spry*, 238 F. App'x at 149; *Joseph v. Coyle*, 469 F.3d 441, 472 (6th Cir. 2006).

Hicks responds that the alleged prejudiced he suffered would not have been relieved by a continuance because Priscilla Claudio had already testified at that point. Reply Br. at 14. Hicks argues that "counsel may be reluctant to recall Government witnesses 'and ask crucial questions relating to his client's case without the ability to do his own investigation first.'" *Id.* at 14-15 (citing *Garner,* 507 F.3d at 407). However, the opportunity to do his own investigation is precisely why

11

defense counsel should have requested a continuance if it was necessary. In *United States v. Spry*, 238 F. App'x 142, 149 (6th Cir. 2007), this court answered a similar question, determining that even though the witness had already testified, the delayed disclosure of a document containing impeachment material did not constitute a *Brady* violation because defense counsel could have requested a continuance or recalled the witness.

In addition, much of the information put forth by Hicks would have been inadmissible, and his suggestions for how he could have procured admissible information are untenable. The existence of probably insurmountable hearsay problems makes it less likely that earlier disclosure would have changed matters, *United States v. Bruce*, Nos. 95-6046 to 95-6049, 1996 WL 640468, at *6 (6th Cir. Nov. 5, 1996), and is relevant to whether the outcome of the trial was materially affected, *United States v. Krebs*, 788 F.2d 1166, 1176 n.8 (6th Cir. 1986). The fact that Hicks offers largely hearsay evidence to support his *Brady* claim does not adequately undermine confidence in his guilty verdict.

The Government correctly points out that Hicks could not have admitted his own "self-serving" statements, Appellee Br. at 28, though Hicks responds that these statements would only have been admitted as lead-ins to Priscilla Claudio's statements. Reply Br. at 21. The conversation with Tracy Hicks in which she recalled Priscilla Claudio's confession that it was Priscilla's brother who had the gun was "hearsay within hearsay" and thus inadmissible, *id.* at 29, which Hicks concedes, Appellant Br. at 30. Beyond potentially impeaching Priscilla Claudio, there is no reason her statements were admissible as substantive evidence, because she was not unavailable. Fed. R. Evid. 804. Though Hicks argues that she refused to testify, Reply Br. at 18-19, there is no evidence of this in the record and Hicks does not cite any. Hicks also claims that Priscilla suffered memory

12

loss; however, the testimony highlighted by Hicks simply suggests that Priscilla did not remember everything about that night, not that she had forgotten a fact as critical as who had the gun. *Id.* at 19-20.

Finally, to the extent that inadmissible evidence could have "le[d] directly to" admissible evidence, *United States v. Phillip*, 948 F.2d 241, 249-50 (6th Cir. 1991), Hicks already had all that he needed by being a party to the conversations. Hicks knew what Priscilla Claudio had said on the tapes, and thus could have further impressed upon her the need to tell this version of events at trial. Hicks also suggests that if he had had access to the tapes, "he may have put Priscilla Claudio and Tracy Hicks in a room together to see if Tracy Hicks could convince Priscilla to come forward with the truth." Appellant Br. at 31. However, Hicks already knew this version of events from Tracy Hicks, and not having the phone recordings did not prevent him from putting both women in a room together if that was indeed necessary for his defense. Hicks also knew Tasha's name from his conversation with Priscilla, and if he needed "to ask Tasha what she knew about the case," *id.* at 31, he could have done so. Hicks did not need the phone recordings for any of these alleged trial strategies.

Hicks agreed to the solution offered by the district court regarding the delayed disclosure of the prison phone recordings. Because he cannot now credibly explain how the delay affected his ability to prepare a defense, and how the tapes would have undermined his guilty verdict, Hicks has not proven prejudice and thus cannot establish a *Brady* claim.

As for Hicks's second argument regarding an alleged *Brady* violation, despite Hicks's claims to the contrary, the phone recordings do not reveal that Hicks's conviction was based upon false testimony. For this "specific type of *Brady* violation" (a "knowing-presentation-of-false-

13

testimony claim"), *Rozencrantz v. Lafler*, 568 F.3d 577, 583 (6th Cir. 2009), "the materiality assessment is less stringent" than a traditional *Brady* violation, *id.* at 584, requiring only that there be "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 104 (1976).

As Hicks cannot prove that the Government relied on false testimony, much less that this testimony affected Hicks's conviction, his claim must fail. "To prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Rosencrantz*, 568 F.3d at 583-84. Regardless of whether the recordings were material, Hicks cannot meet the first or third prong of this test.

Under the "indisputably-false requirement," *id.* at 586, Hicks cannot establish that the Government introduced fabricated testimony or failed to correct any false testimony at his trial. With this type of claim, "[t]he burden is on the defendant[ ] to show that the testimony was actually perjured." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). Hicks cannot meet this burden. The Government corrected the only testimony that it knew for certain was false—namely, Priscilla Claudio's statements regarding her relationship with Hicks and their phone calls discussing the case.

Hicks also argues that Priscilla Claudio's statements that her brother needed to "man up," prove that one of the three witnesses—Priscilla Claudio, Joseph Claudio, or Terry Morgan—must have lied. There is no proof, however, that Priscilla Claudio's statements to Hicks on the phone, which do not state definitively that she saw her brother with a gun, were not the actual lie. This is especially true considering Priscilla Claudio consistently testified that she did not see who

14

possessed the gun, and even mentioned this to Hicks on the phone. R. 45, Phone Tr. at 41 ("I told them I've never seen a weapon. I've never seen you with a weapon. I've never seen my brother with a weapon, none of that."). Similarly, if Priscilla Claudio did tell Tracy Hicks that it was her brother who had the gun, there is nothing to suggest that this is the truth in light of her consistent testimony at trial.

Even if the testimony were false, Hicks cannot meet his burden to show that the Government knowingly relied on this allegedly fabricated testimony. Hicks argues that Priscilla Claudio's statements on the phone recordings were inconsistent with her testimony at trial, and that this would have undermined confidence in the verdict that it was Hicks who owned the gun. However, while Priscilla Claudio's statements on the recordings may refer to her brother's involvement, at no point does she say definitively that it was her brother's gun. Rather, at various points during the calls, she repeatedly says that she did not see who had the gun, *see, e.g.*, *id.* at 41, a story that is consistent with her testimony. It cannot be inferred that the Government *knew* that Priscilla Claudio's testimony was false, especially when much of what she said on the phone recordings actually supported her testimony in court.

Finally, this court has held that "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Coe*, 161 F.3d at 343. Any inconsistencies, therefore, between the events as recounted by Joseph Claudio, Terry Morgan, or Priscilla Claudio, beyond who owned the gun, cannot form the basis of a "knowing-presentation-of-false-testimony" claim. To the extent there are inconsistencies, these can be easily explained by faulty memory or the level of intoxication of the witnesses at the time the events occurred. As there is not enough

evidence for Hicks to argue that the Government knowingly relied on false testimony to secure his conviction, Hicks's *Brady* claim in this regard also fails.

Because Hicks is unable to prove either that the mid-trial disclosure of the prison phone recordings were prejudicial, and thus affected the outcome of his trial, or that there is a reasonable likelihood that his conviction was based on false testimony, Hicks cannot establish a *Brady* violation.

With regard to Hicks's second argument on appeal, the district court committed no error, much less plain error, by admitting the parties' stipulations concerning elements of a felon-in-possession-of-a-firearm conviction. Hicks was charged with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1), and stipulated to three of the four elements of this offense, namely that: (1) he was a felon, (2) the firearm at issue in this case was "fully operable" and thus "a 'firearm' as defined by federal law," and (3) the firearm was manufactured in Belgium and therefore "affects foreign and/or interstate commerce" because "it had to have crossed a national border and/or state line to end up in Michigan." R. 23, Stipulations. Hicks vigorously contested the remaining element, possession of the firearm, at trial. Hicks concedes that he did not "formally object to the admission of the stipulations," Appellant Br. at 38, despite being given an opportunity to do so by the district court. R.37, Trial Tr. at 171. To justify this failure to object, Hicks explains that there was no objection because "defense counsel is one of the parties responsible for this error." Reply Br. at 26. However, if this claim has merit—which it does not—this would be a ground for an ineffective assistance of counsel claim, not an claim regarding alleged constitutional safeguards for factual stipulations. In *United States v. Monghan*, 409 F. App'x 872, 874-78 (6th Cir. 2011), for instance, we analyzed an ineffective assistance of counsel claim in this context independently

16

from the underlying unknowing waiver claim. Because Hicks's defense counsel did not object, we apply plain error review. *See id.* at 875.

There was no error, and moreover, we decline Hicks's invitation to "hold, as a matter of law, that stipulations to an element (or elements) are not valid unless there is some evidence in the record that the defendant expressly, and affirmatively, agreed to the stipulation." Appellant Br. at 34. While not asking for a full Rule 11 colloquy, Hicks makes the vague argument that district courts should at least "do *something* to ensure that such stipulations are being entered into knowingly." Appellant Br. at 38.

Hicks's contentions are defeated by the persuasive reasoning of our holding, albeit unpublished, in *Monghan*. In a factually similar situation, we held that there was "no error, let alone plain error," *id.* at 876, when a defendant stipulated to a number of elements of being a felon in possession of a firearm, including his felon status, the place and manufacture of the firearm, and the operability of that firearm—the same stipulations that Hicks made. Like Hicks, Monghan argued that these stipulations "violated his right to a trial by jury" and required constitutional safeguards. *Id.* at 874. Though Monghan, like Hicks, stipulated to the majority of the elements for being a felon in possession of a firearm, he hotly contested the element of possession, specifically whether he had used the firearm in a bank robbery. Because this was the "critical" element of conviction under 18 U.S.C. § 922(g)(1), we held that the stipulations did not amount to a de facto guilty plea and thus did not require evidence that Monghan had entered into the stipulations voluntarily and knowingly. We relied on the Fourth Circuit's holding to the same effect in *United States v. Muse*, 83 F.3d 672 (4th Cir. 1996). There is nothing unusual about Hicks's case that warrants a different resolution here.

17

Hicks's stipulations do not amount to a de facto guilty plea. The stipulations in this case are "routine." Hicks stipulated to facts that were facially valid or easy to verify, while vigorously contesting the "critical element" of the case—namely, whether he was in possession of the firearm. Appellee Br. at 44. Hicks's felony status was easy to verify, as Hicks's record showed that he had been convicted in Michigan state court for "at least one crime punishable by imprisonment for a term in excess of one year." R. 23, Stipulations. The Government also introduced the firearm in question as Exhibit No. 1, and it would have been easy to call an expert to testify that the Sable Baby .22 caliber revolver is an operable firearm manufactured in another country, thus affecting interstate commerce. Because Hicks's defense counsel only stipulated on Hicks's behalf to elements that were facially valid and easy to verify, *id.*, the stipulations can in no way have affected Hicks's substantial or constitutional rights.

Cases in which we have required a showing that the defendant personally agrees to stipulate to elements of a crime are materially different. For instance, we held in *Julian v. United States*, 236 F.2d 155, 158 (6th Cir. 1956), that an individual's stipulation to felonious intent amounted to a plea of guilty, and thus the district court should have ensured that the defendant had voluntarily and knowingly entered into the stipulation. In *Witherspoon v. United States*, 633 F.2d 1247, 1248 (6th Cir. 1980), the defendant stipulated to every element of a being a felon in possession of a firearm charge with the intent of challenging the charge based on the Second Amendment. Ultimately, though we held that the district court had not committed any error, we did "suggest to the District Courts that they consider the possible applicability of the terms of Rule 11 in any instance where a stipulation as to most or all of the factual elements necessary to proof of guilt of a crime is tendered. If applicable, the strictures of the rule should be followed." *Id.* at 1252. These

18

two cases stand for at most the proposition that "where a defendant stipulates to all of the elements of an offense or otherwise so reduces the government's burden that the stipulation amounts to a de facto guilty plea, the district court should conduct a colloquy in compliance with Rule 11." *Monghan*, 409 F. App'x at 875. But as shown above, Hicks did not stipulate to all the elements of his offense, and indeed vigorously challenged the only one he had a chance of winning on.

Nothing in this circuit's case law supports Hicks's request for "*something* to ensure that such stipulations are being entered into knowingly." Appellant Br. at 38 (emphasis in original). At best, Hicks provides an argument for a "best practice" that district courts could follow, more searching than the one already articulated by this court in *Witherspoon*, 633 F.2d at 1252. A purported "best practice" is not enough for the panel to determine that the district court committed an error, let alone a plain error, by not verifying that Hicks voluntarily and knowingly agreed to the facially valid factual stipulations.

As for Hicks's last argument on appeal, viewing all of the evidence in the light most favorable to the Government, there was sufficient evidence for a rational trier of fact to have found beyond a reasonable doubt that Hicks was a felon in possession of a firearm. On appeal, this court draws "inferences in the light most favorable to the Government" and "refrain[s] from independently judging the credibility of witnesses or weight of the evidence." *United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). To sustain Hicks's conviction, the evidence need not "remove every reasonable hypothesis except that of guilt." *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)). Under this deferential standard, the Government has provided sufficient evidence for a reasonable juror to have found Hicks guilty of being a felon in possession

19

of a firearm. The district court therefore properly denied Hicks's Rule 29 motion for judgment of acquittal.

Hicks argues that the evidence supports, "*at best . . .* an equal likelihood of possession by either Joseph or Mr. Hicks," Appellant Br. at 45, and that the "choice of reasonable probabilities cannot be said to be sufficiently substantial to sustain a criminal conviction upon appeal." *United States v. Jenkins*, 345 F.3d 928, 942 (6th Cir. 2003) (quoting *United States v. Van Hee*, 531 F.2d 352, 357 (6th Cir. 1976)). However, the evidence cited by Hicks—especially when viewed in the light most favorable to the prosecution—either supports upholding Hicks's conviction or is neutral.

First, though Hicks claims that Joseph Claudio and Terry Morgan's version of the events that night "is dubious on its face," Appellant Br. at 43, both witnesses provided similar accounts. Both Joseph Claudio and Terry Morgan stated that it was Hicks who had the gun, that Hicks was in the driver's seat at the time the shooting took place, and that Hicks shot the gun out the front passenger window, across the body of Morgan. R. 37, Trial Tr. at 92-93, 150-151. Even though it was Joseph Claudio's car, Joseph was sitting in the backseat, and the small handgun case was found under the driver's seat. *Id.* at 11, 93. In addition, although Priscilla Claudio did not necessarily support the version of events put forth by Joseph Claudio and Terry Morgan, she did not directly contradict their statements and simply denied knowing who had the gun that night.

Second, to the extent that there are "numerous inconsistencies" between the witnesses' versions of events, Appellant Br. at 26-27, 42-43, it is not the job of the appellate court to weigh the credibility of the witnesses. *United States v. Bearden*, 274 F.3d 1031, 1039 (6th Cir. 2001). This is true even though the witnesses had admittedly been drinking the night of the events in

question. R. 37, Trial Tr. at 84, 87, 157. In convicting Hicks, the jury found the witnesses to be credible, and this court should not supplant its own determinations for that of the jury.

Third, some of the facts that Hicks points to as evidence of his innocence or indicative of Joseph Claudio's guilt are neutral at best when viewed in the light most favorable to the Government. For instance, the fact that the police did not find fingerprints on the gun does not implicate either Joseph Claudio or Hicks. Appellant Br. at 41; Reply Br. at 29. Similarly, though Officer Wilcox witnessed Joseph Claudio throw the gun out of his window, Joseph Claudio's explanation that Hicks handed the gun back to him from the front seat is plausible if we view the evidence in the light most favorable to the Government. Finally, though Hicks could have been fleeing the crime scene because he was the "only felon in the car," Reply Br. at 41, the jury was free to consider this fact when it determined that Hicks was guilty.

Fourth, although the disputed phone recordings are part of the record on appeal, and this court must consider "the record as a whole," *United States v. Sherlin*, 67 F.3d 1208, 1214 (6th Cir. 1995) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)), it is questionable whether review for sufficiency of the evidence should look to evidence not before the jury. This is because an insufficiency-of-the-evidence claim conceptually precedes other constitutional claims raised on appeal, *see Patterson v. Haskins*, 470 F.3d 645, 650-60 (6th Cir. 2006), and thus takes into account the evidence actually presented to the jury, not the evidence that should have been presented to the jury.

Even if we take such evidence into account, however, the statements relied upon by Hicks are not enough to prevent a rational trier of fact from finding that Hicks was guilty of being a felon in possession of a firearm. None of the statements in the tapes, except Tracy Hicks's retelling of

21

her conversation with Priscilla Claudio, affirmatively states that it was Joseph Claudio who owned the gun. In fact, Priscilla Claudio's statements are undermined by her own admission that she had previously lied to federal officers. R. 45, Phone Tr. at 20-21.

It is true that prior to the shooting Hicks was in a club with a metal detector, and there is no indication that either Priscilla Claudio or Hicks went somewhere else before being picked up by Joseph Claudio. Reply Br. at 27. While it is difficult to reconcile these facts with the testimony, any doubts raised are countered by the fact that the gun was shot out of the front passenger seat and Joseph Claudio was in the back of the vehicle. Viewing the evidence in the light most favorable to the Government, the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that Hicks was guilty of being a felon in possession of a firearm.

For the foregoing reasons, Hicks's conviction is affirmed.

**JULIA SMITH GIBBONS, concurring.**  I concur in Judge Rogers's opinion but write separately to make one point.  The panel opinion does not reach the issue of whether the tapes were in fact *Brady* material in the first place, choosing instead to resolve the *Brady* issue on prejudice grounds.  While its logic is sound, the case can also be easily resolved on the basis that these tapes do not fall within the ambit of *Brady*.  The conversations memorialized in the tapes were conversations in which defendant Hicks was a participant.  Whether or not Hicks knew that the conversations were recorded, he knew their contents, which could have provided the basis for cross-examination of Priscilla Claudio during her initial testimony.  No *Brady* violation exists "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' or where the evidence is available to defendant from another source." *United States v. Clark*, 928 F.2d, 733, 738 (6th Cir. 1991) (quoting *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988), and citing *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986)).  This is a well-settled rule and is directly applicable here.  Hicks knew the essential facts enabling him to take advantage of any exculpatory information imparted to him in the conversations before the government disclosed the existence of the recordings.  Nothing further is required to analyze the *Brady* issue.